FILED
RICHARD W. NAGEL
CLERK OF COURT
2017 OCT 10 PM 1:31
U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST. DIV. COLUMBUS

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

Sophia's Cure Inc. a/k/a
Sophia's Cure Foundation,

    Plaintiff,

v.

Case No. 2:16-cv-865

AveXis, Inc., *et al.*,

Judge Michael H. Watson
Magistrate Elizabeth P. Deavers

    Defendants.

## OPINION AND ORDER

Sophia's Cure Inc., a/k/a Sophia's Cure Foundation ("Plaintiff"), brings this suit alleging claims for breach of contract against Nationwide Children's Hospital ("NCH"), the Research Institute at Nationwide Children's Hospital (the "Research Institute"), Nationwide Children's Hospital Foundation (the "Foundation"), and for tortious interference with contract against AveXis, Inc. ("AveXis"), Brian Kaspar ("Kaspar"), Sean Nolan ("Nolan"), Arvind Sreedharan ("Sreedharan"), and John Carbona ("Carbona"). The Court possesses federal diversity jurisdiction pursuant to 28 U.S.C §1332. All the defendants moved pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss Plaintiff's claims against them for failure to state a claim. Plaintiff responded and all defendants replied. For the reasons that follow, the motions to dismiss, ECF Nos. 36, 37, 38, and 48, are **GRANTED**.

## I. FACTS

These facts, taken from Plaintiff's First Amended Complaint and the exhibits attached thereto, are assumed true for purposes of this Opinion and Order.

Plaintiff is a non-profit 501(c)(3) public charity that Vincent and Catherine Gaynor (the "Gaynors") founded after their daughter, Sophia, was diagnosed with spinal muscular atrophy ("SMA"), a genetic disease affecting the part of the nervous system that controls voluntary muscle movement. Am. Compl. ¶¶ 2, 24, ECF No. 34. Plaintiff was created to assist funding SMA research and to provide advocacy, awareness, education, and support for families affected by SMA. *Id.* at ¶ 2.

NCH is an Ohio non-profit organization. *Id.* at ¶ 13. The Research Institute, a subsidiary of NCH, is also an Ohio non-profit organization. *Id.* at ¶ 15. The Research Institute provides basic, clinical, translational, and health services research at NCH. *Id.*

In 2010, the Gaynors met Kaspar, a member of the Research Institute's faculty. *Id.* at ¶ 3. The Gaynors developed a friendly relationship with Kaspar and ultimately decided to provide him with financial support to research a cure for SMA. *Id.* at ¶¶ 31, 32.

On June 7, 2011, Plaintiff entered into a grant agreement with the Research Institute. Am. Compl. Ex. 1, ECF No. 34-1, PAGEID # 188. That agreement provided that Plaintiff would initially donate $500,000 to the Research

Institute to fund pre-clinical research for a drug called scAAV9, which was designed to treat patients with Type 1 SMA. *Id.*

Later, on October 15, 2012, Plaintiff entered into an agreement ("Donation Agreement") with the Foundation in order to secure matching funds from the Foundation to the Research Institute. Am. Compl. Ex. 2, ECF No. 34-2, PAGEID # 193. The Foundation, another subsidiary of NCH, is an Ohio non-profit that "builds philanthropic partnerships with individuals, corporations, and organizations, to advance NCH's programs of patient care, advocacy, research, education, and service." Am. Compl. ¶ 14, ECF No. 34. The Donation Agreement explicitly states that it is "made by and between [Plaintiff] and the [Foundation]." *Id.* The document includes the following relevant provisions:

DONATION AGREEMENT . . . .

PURPOSE OF GENE THERAPY DONATION AGREEMENT

The purpose of this agreement is to outline a donation pledge and matching donation by and between [Plaintiff] and [the Foundation] for the funding of clinical work associated with the Phase 1 Vascular Gene Transfer of the Survival Motor Neuron Gene by scAAV9 for SMA Type 1 patients ("hereinafter, the PROJECT"), as described in an Investigational New Drug application[1] to be submitted to the Food and Drug Administration by the [Research Institute] . . . .

PROPOSED DONATION BY [Plaintiff]

[Plaintiff] hereby agrees to gift to [the Research Institute], on or before December 31, 2012, $550,000 (FIVE HUNDRED AND FIFTY

---

[1] An investigational drug cannot be administered to humans (*i.e.* clinical research cannot be done) until an Investigatory New Drug ("IND") application is submitted to, and approved by, the Food and Drug Administration ("FDA"). *See generally* 21 C.F.R § 312.1 *et seq.*

> THOUSAND DOLLARS] for the purposes of funding the PROJECT
> . . . .
>
> MATCHING DONATION BY [the Foundation]
>
> [the Foundation] hereby agrees that, in consideration of [Plaintiff's] significant contribution to [the Research Institute's] research into a cure for [SMA] . . . [the Foundation] will match [Plaintiff's] gift with its own $550,000 donation to the Research Institute to be used to fund the PROJECT . . . .
>
> PUBLIC RECOGNITION OF [Plaintiff's] ROLE
>
> In all publications issued by [the Foundation] that reference the PROJECT, [Plaintiff] shall be recognized by name—The Sophia's Cure Foundation— as the primary sponsor of the PROJECT . . . .

*Id.*

In 2013, the Research Institute submitted an Investigational New Drug ("IND") Application for scAAV9 to the FDA. Am. Compl. ¶ 58, ECF No. 34. Plaintiff alleges that it was not named as a "sponsor" in that document. *Id.* In September of 2013, the FDA approved the Research Institute's IND Application. *Id.* at ¶ 62.

In October of 2012, Kaspar assumed several positions, including Chief Scientific Officer, at AveXis, a biotech company. AveXis is "'committed to moving gene therapies into the clinical setting for patients and families devastated by rare and orphan neurological diseases.'" *Id.* at ¶ 30. Kaspar did not give up his position at the Research Institute. *See id.* at ¶ 16.

In October of 2013, AveXis entered into an agreement with NCH which provided AveXis with a license to the Research Institute's IND Application for scAAV9, and the right to become its sponsor after completion of Phase 1 clinical

trials. *Id.* at ¶¶ 30, 66. On October 3, 2014, the FDA designated scAAV9 as an orphan drug.[2] *Id.* at ¶ 83. On October 14, 2015, AveXis exercised its right to sponsor the Research Institute's IND Application. *Id.* at ¶ 106.

Plaintiff filed suit, alleging that the Foundation, the Research Institute, and NCH breached the Donation Agreement by not identifying Plaintiff as "sponsor" in the IND Application submitted by the Research Institute and in clinical trials registered by NCH. *Id.* at ¶¶ 115, 58, 78. Plaintiff also alleges that it has been damaged as a result of this breach because the Orphan Drug Act, 21 U.S.C. § 360cc(a), provides certain benefits to the sponsor of an orphan drug, including the exclusive right to market an orphan drug for seven years. *Id.* at ¶¶ 7, 86. Plaintiff further alleges that the Foundation, the Research Institute, and NCH are all liable for this breach because these entities acted as alter egos of one another. *Id.* at ¶ 117.

Plaintiff also alleges that AveXis; Kaspar; AveXis's former CEO, Carbona; AveXis's current CEO, Nolan; and AveXis's VP of Business Operations, Sreedharan, tortiously interfered with the Donation Agreement by intentionally inducing the Foundation, the Research Institute, and NCH to breach it. *Id.* at ¶ 125.

All defendants move to dismiss the pertinent claims against them for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

---

[2] An "orphan drug" is defined by the Orphan Drug Act as a drug used to treat a "rare disease," that is, a disease affecting fewer than 200,000 people in the United States. *See* 42 U.S.C. § 287a-1(c).

## II. STANDARD OF REVIEW

A claim survives a motion to dismiss pursuant to Rule 12(b)(6) if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citaion omitted). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks and citation omitted). A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all of the complaint's allegations are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007) (internal citations omitted).

A court must also "construe the complaint in the light most favorable to the plaintiff." *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). Nonetheless, a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; see *also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). "[A] naked assertion . . . gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility . . . ." *Twombly*, 550 U.S. at 557.

## III. ANALYSIS

### A. Breach of Contract Claims against the Foundation, the Research Institute, and NCH (Count 1 of the First Amended Complaint)

Plaintiff alleges breach of contract by the Foundation, the Research Institute, and NCH. All three move to dismiss this claim. The parties agree that Ohio law governs this dispute.

Under Ohio law, the essential elements of breach of contract are: (1) the existence of a contract; (2) performance by the plaintiff; (3) the defendant's breach; and (4) damages or loss to the plaintiff. *Kline v. Mortg. Elec. Registration Sys., Inc.*, No. 16-3932, 2017 WL 3263745, at *8 (6th Cir. Aug. 1, 2017) (citing *Siemaszko v. FirstEnergy Nuclear Operating Co.*, 187 Ohio App. 3d 437, 444 (2010)).

Plaintiff alleges that the Foundation, the Research Institute, and NCH all breached the Donation Agreement between Plaintiff and the Foundation. Plaintiff points to one provision of the Donation Agreement as the basis of its breach of contract claim. That provision stipulates that Plaintiff would be identified as the "primary sponsor" in: 1) all publications, 2) issued by the Foundation, 3) that reference the "PROJECT." Am. Compl. Ex. 2, ECF No. 34-2, PAGEID# 193.[3] The Donation Agreement defines "PROJECT" as "clinical work associated with . . . scAAV9 for SMA Type 1 patients" and indicates that this clinical work would be

---

[3] The Court may consider the Donation Agreement, attached to the Complaint as Exhibit A, in determining whether dismissal is proper, and may rely upon it in lieu of inconsistent allegations in the Amended Complaint. *Williams v. CitiMortgage, Inc.* No. 2:08-cv-368, 2011 WL 1303257, at * 4 (S.D. Ohio Mar. 31, 2011) aff'd, 498 F. App'x 532 (6th Cir. 2012).

"described in an [IND] application to be submitted to the Food and Drug Administration by [the Research Institute]." *Id.*

### 1. Plaintiff Fails to Allege that any Party to the Donation Agreement Breached its Terms

Plaintiff does not point to any publications issued by the Foundation that constitute a breach of the Donation Agreement. Plaintiff points instead to the actions of the Research Institute and NCH. Specifically, Plaintiff asserts that the Research Institute's IND Application and NCH's registration for clinical trials failed to recognize Plaintiff as the "primary sponsor," and therefore the Foundation, the Research Institute, and NCH were all in breach of the Donation Agreement. Am. Compl. ¶¶ 5, 58, 78.

The flaw in these allegations is that neither the Research Institute nor NCH is a party to the agreement to which Plaintiff attempts to bind them. Plaintiff does not allege any facts regarding the *Foundation's* breach of the Donation Agreement. Rather, Plaintiff's entire breach of contract claim hinges on the contents of the IND Application submitted *by the Research Institute* and the clinical trial information registered *by NCH*. A non-party to a contract, however, cannot be liable for its breach. *Three-C Body Shops, Inc. v. Nationwide Mut. Fire Ins. Co.*, No. 16AP-748, 2017 WL 1407305, at *3 (Ohio Ct. App. April 20, 2017) (quoting *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) ("It goes without saying that a contract cannot bind a nonparty.")); *see also Samadder v. DMF of Ohio, Inc.*, 154 Ohio App. 3d 770, 778, 2003-Ohio-5340 (10th Dist.) (explaining

that "[a] contract is binding only upon parties to a contract and those in privity with them").

Plaintiff points to no language—and indeed the agreement contains none—that imposes any duties or liabilities on the Research Institute or NCH. In fact, the first paragraph of the Donation Agreement states that it "is made by and between [Plaintiff] and [the Foundation]." Am. Compl. Ex. 2, ECF No. 34-2, PAGEID # 193. It is signed by Vincent Gaynor, on behalf of Plaintiff, and Timothy Robbins, on behalf of the Foundation. *Id.* Thus, it is clear that Plaintiff and the Foundation are the only parties to the Donation Agreement. For this reason alone, Plaintiff's breach of contract claims against the Foundation, the Research Institute, and NCH fail.

Acknowledging that NCH and the Research Institute are not parties to the Donation Agreement, Plaintiff nevertheless asserts that the Foundation, NCH, and the Research Institute can be held liable for a purported breach of the agreement pursuant to an alter ego theory and under agency principles. The Court disagrees.

### 2. Plaintiff Fails to State a Breach of Contract Claim under an "Alter Ego" Theory of Liability

Under Plaintiff's interpretation of the alter ego doctrine, the Research Institute, NCH, and the Foundation, are all parties to the Donation Agreement because "all three entities are alter egos of the other" and are therefore "one and the same." Am. Compl. ¶ 116, ECF No. 34; Plaintiff's Response 10, ECF No. 52.

Plaintiff asserts each entity is the other's alter ego because they all share the same address, facilities, website, Secretary, and Treasurer, as well as one or more members of their Boards of Directors. *Id.* ¶¶ 118–20. Additionally, Plaintiff alleges that the Donation Agreement was signed by Timothy Robinson, who is the Treasurer and on the Board of Directors for all three entities. These allegations, according to Plaintiff, are sufficient to impute the actions of the Research Institute and NCH to the Foundation and thereby make out a claim for breach of contract against all three based on the terms of the Donation Agreement between Plaintiff and the Foundation.

In this way, Plaintiff erroneously attempts to bend the alter ego theory of liability into a free-standing cause of action against non-parties to a contract. Alter ego liability, often characterized as the first prong of the test for "piercing the corporate veil,"[4] is not a theory giving rise to an independent cause of action;

---

[4] There is some uncertainty in the law as to whether the concepts of alter ego and piercing the corporate veil are analytically distinct. *Compare In Re Fisher*, 296 F. App'x 494, 506 (6th Cir. 2008) ("This court has explained . . . that veil piercing and *alter ego* concepts are distinct. The former asks a court to hold A vicariously liable for B's debts, while the latter asserts that A and B are the same entity and therefore liability is direct." (quoting *IUUA Local 600 v. Aguirre*, 410 F.3d 297, 302 (6th Cir. 2005) (applying the alter ego doctrine and holding a shareholder liable for fraudulent transfers of money made through his corporation that the court found was his alter ego)), *with Hitachi Med. Sys. Am., Inc. v. Branch*, No. 5:09-cv-1575, 2010 WL 3941824, at *3 (N.D. Ohio Sept. 14, 2010), *report and recommendation adopted*, No. 5:09-cv-01575, 2010 WL 3941912 (N.D. Ohio Oct. 7, 2010) (noting that *In Re Fisher*'s assertion that the veil-piercing and alter-ego concepts are distinct seems to conflict with the Ohio Supreme Court's characterization of the first element of the veil-piercing test as "a concise statement of the alter ego doctrine") (citing *Belvedere*, 67 Ohio St. 3d at 288)). Regardless, the distinction makes little difference in this case, as Ohio law has been clear that alter ego liability is a method of obtaining recovery from a defendant based on an underlying cause of action. *See Secrest*, 2015-Ohio-42, at ¶ 34. In every case applying Ohio

rather, it is a theory of recovery that depends on the existence of an underlying claim. *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.*, 67 Ohio St. 3d 274, 287, 1993-Ohio-119 (1993); *Secrest v. Gibbs*, 11th Dist. Lake No. 2014-L-004, 2015-Ohio-42, ¶ 34 (stating that "standing alone," claims based upon either alter ego or veil piercing "create no independent causes of action"); *Ruffing v. Masterbuilt Tool & Die, LLC*, No. 1:08-cv-01264, 2009 WL 185950, at *13 (N.D. Ohio Jan. 23, 2009) (noting that the alter ego doctrine allows a plaintiff to seek recovery from a shareholder for a cause of action that would otherwise proceed only against a corporate entity); *Lester v. Wow Car Company, Ltd.*, No. 2:11-cv-850, 2013 WL 6058676, at *6 (S.D. Ohio Nov. 14, 2003) (noting that the alter ego doctrine "allow[s] someone with a claim against an individual to reach corporate assets to satisfy that claim" (quoting the Magistrate Judge's Opinion and Order, ECF NO. 78); *see also* 1 Fletcher Cyc. Corp. § 41.10 (footnotes omitted) ("A finding of fact of alter ego, standing alone, creates no cause of action. *It merely furnishes a means for a complainant to reach a second corporation or individual upon a cause of action that otherwise would have existed only against the first corporation.*" (emphasis added) (citing *Belvedere*, 67 Ohio St. 3d 274).

---

law that this Court has reviewed, the alter ego doctrine has been used by a plaintiff attempting to satisfy a judgment or collect a debt. *See e.g., In re Fisher*, 296 F. App'x at 494 (applying the alter ego concept to hold a shareholder liable for debts he attempted to shield from a creditor through fraudulent transfers of assets to his corporation).

The alter ego doctrine allows a plaintiff to "hold a second corporation liable *for the corporate misdeeds of the first* . . . when a controlling shareholder [or parent] misuses his control of the corporation to commit specific, egregious acts that injure a third party." *Minno v. Pro-Fab, Inc.*, 121 Ohio St. 3d 464, 468, 2009-Ohio-1247, ¶ 13; *see also Dombroski v. Wellpoint, Inc.*, 119 Ohio St. 3d 506, 2008-Ohio-4827, 895 N.E.2d 538 (2008). Alter ego liability is founded on the principle that it would be "unjust to allow . . . [a] shareholder to use the corporate form as a shield to escape the consequences of [its] wrongful acts. *Minno*, 121 Ohio St. 3d at 467. It therefore arose as an exception to the general rule that "shareholders, officers, and directors are not liable for the debts of the corporation" and allows courts to disregard the corporate form and hold a parent company liable for the debts or judgments arising from a subsidiary's misdeeds. *Belvedere*, 67 Ohio St. 3d at 287 ("[T]he 'veil' of the corporation can be 'pierced' and individual shareholders held liable for corporate misdeeds when it would be unjust to allow the shareholders to hide behind the fiction of the corporate entity.").

Here, Plaintiff does not seek to use the alter ego doctrine to hold NCH and the Research Institute liable for the misdeeds of the Foundation. Instead, Plaintiff attempts to use it as the basis for its cause of action against NCH and the Research Institute, to hold them liable for their *own* purported misdeeds based on the terms of a contract to which they were not a party. Plaintiff has no underlying cause of action against the Foundation that would allow Plaintiff to

reach the assets of NCH or the Research Institute for purportedly using the Foundation as their alter ego. Instead, Plaintiff has attempted to use the alter ego doctrine to create a cause of action for breach of the Donation Agreement against NCH, the Research Institute, and the Foundation based on actions that the Foundation—the only signatory to the Donation Agreement—did not take. Because the alter ego doctrine cannot be used in this way, Plaintiff's claims against the Foundation, the Research Institute, and NCH fail.

### 3. Plaintiff fails to State a Breach of Contract Claim under Agency Principles

Plaintiff alternatively alleges that NCH and the Research Institute are bound to the terms of the Donation Agreement under principles of agency. "[A] complaint relying on agency must plead facts which, if proved, could establish the existence of an agency relationship." *Barrett-O'Neill v. Lalo, LLC,* No. 2:14-CV-194, 2014 WL 3895679, at *3 (S.D. Ohio Aug. 8, 2014) (collecting cases) (internal quotation marks omitted).

Plaintiff makes one explicit agency allegation, "[t]he Research Institute and NCH are liable for breach of the Donation Agreement because the Foundation acted as their agent." Am. Compl. ¶ 121, ECF No. 34. This sole allegation "is a conclusory statement of a legal proposition without any supporting factual allegations to demonstrate its plausibility." *Kendall v. Phoenix Home Health Care Servs. Ltd.,* No. 2:15-CV-3009, 2016 WL 5871506, at *3 (S.D. Ohio Oct. 7, 2016) (quoting *Bricker v. R & A Pizza, Inc.,* 804 F. Supp. 2d 615, 622 (S.D. Ohio 2011).

Under Ohio law, "the primary distinguishing characteristic of an agency relationship is the right of a principal to control the conduct of an agent when the agent is performing work for it." *Id.* (quoting *Costell v. Toledo Hosp.*, 98 Ohio App. 586, 593 (Ohio Ct. App. 1994)). Plaintiff contends that it has adequately alleged facts demonstrating that NCH and the Research Institute controlled the Foundation because the Donation Agreement was signed by Timothy Robbins on behalf of the Foundation and Robbins served as an officer on the boards of directors of all three organizations. The Court disagrees.

Simply because a signatory to a contract has multiple positions at different companies, even high-ranking positions at related companies, does not automatically establish that those different companies exercise control over each other. Plaintiff further contends that it has adequately alleged that NCH and the Research Institute controlled the Foundation because the Donation Agreement between Plaintiff and the Foundation benefitted the Research Institute. But the fact that the Research Institute received a donation pursuant to the Donation Agreement simply indicates that the Research Institute was a third-party beneficiary. A third-party beneficiary relationship is not equivalent to an agency relationship. Accordingly, Plaintiff's breach of contract claims against the Foundation, the Research Institute, and NCH fail under an agency theory as well.

For all of the above reasons, Plaintiff fails to allege that the Foundation, the Research Institute, or NCH breached the Donation Agreement. The motion to dismiss filed by the Foundation, the Research Institute, and NCH, ECF No. 36, is

**GRANTED** and Plaintiff's breach of contract claims against the same are **DISMISSED**.

### B. Claims for Tortious Interference with Contract against AveXis and the Individual Defendants (Count 2 of the First Amended Complaint)

Plaintiff also alleges tortious interference with contract against AveXis and the individual defendants. Under Ohio law, the elements of tortious interference with contract are: "(1) the existence of a contract; (2) the wrongdoer's knowledge of the contract; (3) the wrongdoer's intentional procurement of the contract's breach; (4) a lack of justification; and (5) resulting damages." *DeBoer Structures (U.S.A.) Inc. v. Shaffer Tent And Awning Co.*, 233 F. Supp. 2d 934, 948–49 (S.D. Ohio 2002) (citing *Fred Siegel Co., LPA v. Arter & Hadden,* 85 Ohio St.3d 171, 176 (1999)). Even assuming a breach of contract occurred in this case—it did not—Plaintiff still fails to sufficiently allege a tortious interference with a contract against any of these defendants.

### 1. Plaintiff Does Not Allege Tortious Interference against Carbona, Nolan, or Sreedharn

To be liable for tortious interference, a tortfeasor must not only have knowledge of the contract, he must have knowledge of the contract at the time of, or before, the alleged breach. *See Lanton v. Ocwen Loan Servicing, LLC*, No. 3:15-CV-372, 2017 WL 633468, at *3 (S.D. Ohio Feb. 15, 2017).

Here, Plaintiff alleges that the Donation Agreement was breached in September of 2013, when the Research Institute submitted the IND Application to the FDA, and in April of 2014, when NCH registered its clinical trial. Am.

Compl. ¶¶ 58, 78. Plaintiff does not allege, however, that AveXis's former CEO, Carbona, possessed personal knowledge of the Donation Agreement or its terms at the time of those alleged breaches. Instead, Plaintiff alleges that on July 30, 2014, three months after NCH registered the clinical trial with the FDA, Carbona requested a copy of the Donation Agreement in an email that stated: "my concern is that there are written provisions in those agreements that I am only vaguely aware of . . ." *Id.* at ¶ 78.

Likewise, Plaintiff does not allege that AveXis's current CEO, Nolan, and AveXis's VP of Business Relations, Sreedharan, possessed personal knowledge of the Donation Agreement or its terms at the time of those alleged breaches. Plaintiff does not, in fact, allege that Nolan or Sreedharan had any contact or dealings with any of the parties prior to June of 2015. Thus, even accepting Plaintiff's material allegations as true, Plaintiff has failed to sufficiently allege a claim for tortious interference against Carbona, Nolan, or Sreedharan.

### 2. Plaintiff Does Not Allege Tortious Interference against AveXis or Kaspar

For liability to attach, a tortfeasor must intentionally procure a breach. *See Lanton*, 2017 WL 633468, at \*3. Plaintiff alleges that Kaspar, AveXis's Chief Scientific Officer, gained knowledge of the Donation Agreement's existence in September of 2012 when he was copied on an email sent to Vincent Gaynor and several others with the Donation Agreement attached. Am. Compl. ¶ 47, ECF No. 34. Furthermore, Plaintiff alleges that Kaspar's purported knowledge of the

Donation Agreement can be imputed to AveXis. *Id.* at ¶¶ 47, 49, 70. Assuming Kaspar's knowledge could be imputed to AveXis on this basis, Plaintiff nonetheless makes no factual allegations that suggest that either Kaspar or AveXis intentionally procured a breach of the Donation Agreement.

Plaintiff alleges that Kaspar and AveXis sought to "induce" *Plaintiff* into signing a confidentiality agreement that would have named AveXis the sponsor of scAAV9 instead of Plaintiff. *Id.* at ¶¶ 91–94. But asking Plaintiff to voluntarily release any alleged sponsorship privileges is not equivalent to inducing other entities to breach an agreement with Plaintiff. Plaintiff also alleges that AveXis exercised an option in its license agreement with NCH to sponsor the IND Application for scAAV9 on October 14, 2015. *Id.* at ¶ 125. But that conduct occurred after the purported breaches in 2013 and 2014 and thus cannot constitute their inducement. Therefore, Plaintiff does not sufficiently allege a claim for tortious interference against Avexis or Kaspar either.

Accordingly, the motions to dismiss filed by Carbona, ECF No. 48; Nolan, Sreedharan, and AveXis, ECF No. 38; and Kaspar, ECF No. 37, are **GRANTED** and Plaintiff's claims against the same for tortious interference with contract are **DISMISSED**.

### IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** the motions to dismiss for failure to state a claim, ECF Nos. 36, 37, 38, and 48. Plaintiff's claims are hereby **DISMISSED without prejudice.** Should Plaintiff choose to amend its complaint

and re-file this case Plaintiff is **DIRECTED** to do so within twenty-one days of the date of this Opinion and Order.

**IT IS SO ORDERED.**

*/s/ Michael H. Watson*

**MICHAEL H. WATSON, JUDGE
UNITED STATES DISTRICT COURT**